IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

CHERRAN CARTER,                          )
         Plaintiff,                     )
                                       )
v.                                       )          Civil Action No. 4:13-cv-00045
                                       )
CAROLYN W. COLVIN,                       )
Acting Commissioner,                     )
Social Security Administration,          )          By:    Joel C. Hoppe
         Defendant.                     )          United States Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Cherran Carter asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying her application for supplemental security income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. Carter asserts that

the Administrative Law Judge ("ALJ") erred in determining that she did not have a severe

impairment or combination of impairments. She asks the Court to reverse the Commissioner's

decision and to award benefits or remand her case for further administrative proceedings.

This Court has authority to decide Carter's case under 42 U.S.C. §§ 405(g) and

1383(c)(3), and her case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12.

After considering the administrative record, the parties' briefs, and the applicable law, I find that

the Commissioner's decision is not supported by substantial evidence in the record. Therefore, I

recommend that this Court reverse the Commissioner's final decision and remand the case for

further administrative proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.*

1

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)) (internal quotation marks omitted). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that

meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not, (5) whether he or she can perform other work. *See* 20 C.F.R. § 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Carter protectively filed for SSI on October 21, 2010. Administrative Record ("R.") 43. She was 58 years old and had not worked since November 22, 1992. R. 43, 128. Carter claimed disability onset date of July 15, 2010, because of arthritis in her knees, diabetes, hypertension, and back pain. R. 43, 45. A state agency denied her application initially and upon reconsideration. R. 12.

Carter appeared with counsel at an administrative hearing on October 13, 2011. R. 24. She testified to her alleged impairments and the limitations they placed upon her daily activities. R. 31–42. A vocational expert was present, but the ALJ determined that he did not need to hear further testimony. R. 40.

In a written decision dated February 29, 2012, the ALJ found that Carter was not disabled under the Act. R. 12–18. He found that she had not engaged in substantial gainful activity since her application date and that she suffered from five medically determinable impairments: "dysfunction of her knees, diabetes mellitus, hypertension, obesity, and back pain." R. 14. He then found that neither Carter's individual impairments nor their combination constituted a "severe" impairment. *Id.* The ALJ also discredited Carter's statements concerning the intensity, persistence, and limiting effects of her impairments to the extent that they contradicted a finding

3

that she did not suffer from a severe impairment or combination of impairments. R. 17. He therefore determined Carter was not disabled and denied her application. R. 18. The Appeals Council declined to review the ALJ's decision on July 19, 2013, and this appeal followed. R. 1.

## III. Discussion

Carter asserts that the ALJ erred in determining that she did not have a severe impairment or combination of impairments. Pl. Br. 16, ECF No. 16. Specifically, she argues that her bilateral knee condition and obesity were severe, the ALJ improperly discounted her complaints of pain and limitations, and the ALJ failed to consider the combined effect of her limitations, especially her obesity. *Id.* at 12–17.

A.      *Relevant evidence*

1.      *Medical Evidence*

Carter's medical record begins with a series of handwritten treatment notes from her primary care physician, Dr. Tomas M. Alabanza, M.D. *See* R. 155–71. These are largely indecipherable. The notes do reveal that Carter saw Dr. Alabanza once for muscle spasms in her back on May 25, 2011, R. 170, and five times for knee pain between December 2009 and August 2011, R. 155, 160, 161, 167, 169. During the same period, Dr. Alabanza's notes include a diagnosis of degenerative arthritis in one or both of her knees six times, R. 155, 160, 161, 165, 169, 171, and of osteoarthritis in one or both of her knees three times, R. 167, 169, 170. Additional legible statements include a note from August 13, 2010, that Ibuprofen did not help alleviate Carter's pain, R. 155, and two notes mentioning Carter's meniscus in relation to her arthritis, from December 15, 2009, R. 161, and April 15, 2010, R. 160.

Dr. Alabanza ordered an X-ray of Carter's knees, which was performed on December 6, 2010. R. 162–63. Carter's left knee showed "mild medial and patellofemoral joint osteoarthrosis

4

with a slight amount of osteopenia." R. 162. Carter's right knee showed "mild medial and patellofemoral joint osteoarthrosis," "small joint effusion," and "possible small ossification within the anterior horn of either the medial or lateral meniscus." R. 163.

Dr. Alabanza referred Carter to Dr. Jonathan Krome, M.D., an orthopedic specialist whom Carter saw on May 31, 2011. *See* R. 194–95. Dr. Krome's evaluation revealed "negative straight leg raise [and] normal motor control over both lower extremities." R. 194. For Carter's right knee, he found "some crepitation of the patellofemoral region," pain from a McMurray's test "on the medial and the lateral aspects," and a lack of "about 5 degrees of extension." *Id.* Dr. Krome proposed to treat Carter with a steroid pack and physical therapy. R. 195.

On June 2, 2011, Carter had her first physical therapy appointment at Danville Orthopedic Rehabilitation Center and underwent a comprehensive examination by physical therapist Ray H. Hayes. R. 192–93. Carter complained of pain throughout her back and in her right knee, stating that her symptoms began in July 2010. R. 192. She reported a pain level of 5/10, with swelling, burning, and deep, sharp aches. *Id.* Mr. Hayes noted that Carter stood with "a weight shift predominately to the left side" and "40 [degree] forward flexion through the mid torso" countered by "a grossly 40 [degree] flexion posture of the hips." *Id.* She also "ambulate[d] with a very mild antalgic gait." *Id.*

Inspecting her back, Mr. Hayes found that Carter's lateral trunk flexion "is restricted 30 percent or greater going to the right" and her "[r]otation is limited slightly when rotating to the left." *Id.* Moving lower, Carter's "[b]ilateral hip extensors traction was noted with the left side meeting in the moderate range and the right side being in the moderate to severe range." *Id.* Inspecting her knees, Mr. Hayes noted her "left hamstring is restricted of 55 [degrees]" and her "right is restricted at 40 [degrees]." *Id.* Mr. Hayes recorded that Carter had pain to palpation

5

"with trigger points to [sic] numerous to mention." *Id.* Trigger points on her left side ranged from mild to moderate and on her right side from moderate to severe. *Id.* Mr. Hayes concluded that Carter "appears to have a very significant biomechanically induced pain syndrome of the low back, hips and knees." *Id.*

On June 7, 2011, Carter returned to physical therapy. R. 191. She reported that her back and knees were improving slightly and noted "the knee is worse than the back." *Id.* She was "very tender in posterior knee," but felt "okay" after the session. *Id.*

When Carter returned on June 16, 2011, physical therapist Joseph A. Nicholson noted that she was having difficulty and was not able to advance. R. 190. Mr. Nicholson stated that he "modified exercises to avoid stressing [her] R knee, blisters and low[er] back." *Id.* There are no further notes from physical therapy until her discharge on August 30, 2011, which was completed in her absence without a physical assessment. R. 185.

Carter returned to Dr. Krome on July 14, 2011. R. 189. Dr. Krome wrote that Carter "continues to have knee pain" that is "unresolved with her conservative treatment." *Id.* Physical examination revealed "medial joint line tenderness," "[m]ild tenderness over the pes," "some anterior tenderness both medially and laterally," and "excellent range of motion." *Id.*

Carter had a magnetic resonance imaging ("MRI") scan of her right knee on July 15, 2011. R. 204. The scan showed an "[o]blique tear . . . of the body of the medial meniscus" and "[m]ild osteoarthrosis medially," but no bone marrow abnormalities. *Id.*

On July 21, 2011, a physical examination by Dr. Krome produced mild findings. R. 188. Carter's right knee had moderate tenderness about the lateral and medial aspects, a slightly diminished pulse, trace effusion, and a McMurray's test positive for pain. *Id.* Dr. Krome found normal warmth, normal sensation, no ecchymosis, no lateral, medial, or posterior instability, and

6

negative results on the Lachman, Plicia, and Anterior Drawer tests. Dr. Krome noted that she

walked with an antalgic gait and appeared to have mild osteoarthritis, but that her pain was more

than he expected. *Id.* He recorded that a scope and debridement of Carter's knee could help with

her pain. *Id.*

On August 4, 2011, Carter had a follow-up MRI scan of her left knee. R. 202. A previous

MRI on January 20, 2011, had revealed "a very small focus of bone marrow edema[1] involving

the proximal shaft of the tibia." R. 206. The follow-up MRI revealed that the edema persisted,

but was "significantly more subtle and appear[ed] less extensive." R. 202. The administering

doctor, G. Michael Spencer, M.D., wrote that this was "certainly encouraging." *Id.*

On August 19, 2011, Carter saw Dr. Krome, who noted that the second MRI scan

indicated such "significant improvement" that the edema did not necessitate further treatment. R.

187. He suggested treatment of the right knee through surgery and Carter consented. *Id.*

Carter underwent surgery on August 30, 2011. R. 178. Dr. Krome performed an

arthoscopy[2] with partial medial meniscectomy and a tricompartmental debridement.[3] *Id.* The

operative note relates these findings:

> The patient had degenerative posterior horn medial meniscal tear. She had grade 3
> changes of the patella,[4] grade 3–4 changes of the trochlea, grade 4 changes of the

---

[1] "Edema is swelling caused by excess fluid trapped in [the] body's tissues." *Edema – Definition*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/edema/basics/definition/con-20033037.

[2] "Arthoscopy is a procedure for diagnosing and treating joint problems" wherein the surgeon inserts a small "fiber-optic video camera through a small incision" to view inside the joint. *Arthoscopy – Definition*, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/arthroscopy/basics/definition/prc-20014669.

[3] Debridement is the "surgical removal of lacerated, devitalized, or contaminated tissue." *Debridement*, Merriam-Webster, *available at* http://www.merriam-webster.com/dictionary/debridement.

medial femur, grade 2–3 changes of the medial tibia, grade 1–2 changes laterally. A moderate amount of synovitis.[5] Some very small loose bodies, approximately 1mm.

*Id.* The note indicates that Dr. Krome completed the procedure without complications. *Id.*

On September 7, 2011, Carter had her first post-operative visit with Dr. Krome. R. 184. She wore an Ace bandage, was taking Lortab,[6] and reported mild pain. *Id.* Dr. Krome prescribed Carter a cane on September 15, 2011, stating that she suffered from "severe degenerative arthritis [illegible] causing 'painful' pressure." R. 220.

Additionally, throughout her treatment, Carter's physicians repeatedly documented her obesity. Standing five feet two inches tall, she weighed 203.6, 207.6, and 215.8 pounds at various times reported in the record. R. 155, 165, 169. Each of these weights gives her a body mass index at the high end of obese. *See Body Mass Index Table*, National Heart, Lung, and Blood Institute, *available at* http://www.nhlbi.nih.gov/health/ educational/lose_wt/BMI/bmi_tbl.pdf.

### 2. Application Materials

Carter completed a Pain Questionnaire, a Function Report, and a Disability Report as part of her SSI application. *See* R. 117, 119, 127. In the Pain Questionnaire, Carter reported that her

---

[4] Arthritis severity is divided into four grades: "Grade 1: Early changes show fissuring (breaks) in the cartilage. Grade 2: More extensive full thickness breaks in the cartilage. Grade 3: Intermittent loss of cartilage with breaks. Grade 4: Exposed subchondral (below the cartilage) bone." *Knee Replacement: Overview*, The Steadman Clinic, http://thesteadmanclinic.com/knee/ overview.asp.

[5] Synovitis is "inflammation of the synovium; it is usually painful, particularly on motion, and is characterized by fluctuating swelling due to effusion within a synovial sac." Dorland's Illustrated Medical Dictionary 1856 (32d ed. 2012).

[6] Lortab is a combination of Hydrocodone and Acetaminophen that is suggested "for the relief of moderate to moderately severe pain." *Physician's Desk Reference* 3315 (60th ed. 2006). Carter was prescribed the second highest of four dosage concentrations for post-operative main management. *Id.*; R. 186.

8

back pain is occasionally so severe that she "can't do anything but lay down" until it passes. R. 118. In her Disability Report, she stated: "[I] can't walk at times my knees hurt so bad and [I] can't stand long in one spot for more than 10 to 15 minutes before my back and knees start aching." R. 127.

The Function Report details her activities of daily living ("ADLs"). She helps prepare her granddaughter, who lives with her and has cerebral palsy, for school. R. 119. She makes her bed, sweeps every other day, and does house work, but it takes awhile as she must rest while working. R. 121–22. She occasionally drives when her knees allow it and shops once a month. R. 122. Her grandson visits her about three times a week. R. 123. She used to cook often, but now cannot stand long enough and instead prepares a full meal maybe once a week and sandwiches otherwise. *Id.* She reported that her ailments affect her ability to squat, bend, stand, walk, sit, kneel, and climb stairs. R. 124.

> 3.      *Testimony*

Carter testified at her administrative hearing. *See* R. 31–41. She related that she is diabetic and has high blood pressure, ulcers, and arthritis in her knees. R. 31. She said her knees were the most bothersome. R. 34. She is unable to walk a city block. R. 34. She testified that the surgery did not help her knee, but made it ache worse, with popping, grinding, and frequent swelling. R. 35. She elevated her feet at night, claimed difficulty bending and squatting, and "can't really go down steps." R. 35, 36. She reported taking Hydrocodone for her knee pain and Prednisone for another ailment, though she could not remember which one. R. 36. She does not drive anymore and cannot cook because she cannot stand for that long. R. 38, 39.

The ALJ asked if her doctor stated how long she would need to use the cane. R. 39. She replied, "He told me it would take awhile, he didn't exactly say how long." *Id.*

*B.*     *Discussion*

At step two of the five-step disability inquiry under the Act, a claimant must prove the existence of a "severe medically determinable physical or mental impairment." 20 C.F.R. § 416.920(a)(4)(ii); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). A medically determinable impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); *see also Craig v. Chater*, 76 F.3d 585, 592 (4th Cir. 1996) (noting that, while pain caused by an impairment can be disabling, subjective complaints of pain alone that are not supported by objective medical evidence of an impairment are insufficient). An impairment "is *not* severe if it does not significantly limit the [applicant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a) (emphasis added). "Basic" work activities include functions like "walking, standing, sitting, lifting, [and] carrying." 20 C.F.R. § 416.921(b)(1).

An impairment should be labeled "not severe only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere" with an applicant's ability to work. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal quotation marks omitted); *Waller v. Colvin*, No. 6:12cv63, 2014 WL 1208048, at *7 (W.D. Va. Mar. 24, 2014) (citing *Evans*, 734 F.2d at 1014). This is not a difficult hurdle for the applicant to clear. *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 474 n.1 (4th Cir. 1999). Still, this Court must affirm the ALJ's severity finding if he applied the correct legal standard and his finding is supported by substantial evidence in the record. *See Meyer*, 662 F.3d at 704.

10

*1.	The ALJ's Severity Finding*

The ALJ found that Carter suffered from five medically determinable impairments: "dysfunction of her knees, diabetes mellitus, hypertension, obesity, and back pain." R. 14. He found that Carter's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." R. 17. He concluded, however, that none of Carter's impairments, individually or in combination, were "severe." *Id.*

The majority of the ALJ's opinion focused on Carter's knee dysfunction, which he found had been adequately addressed with surgery and medication. *Id.* He noted that initial MRIs had found only mild osteoarthritis. *Id.* The meniscus tear discovered by a subsequent MRI had been addressed with surgery, which was completed without complication. *Id.* The ALJ noted that at her first post-operative visit, Carter reported only mild pain. *Id.* While Carter's physician prescribed her a cane, the ALJ found no indication that it was a permanent requirement and therefore concluded that it was "intended to be used in her recovery from knee surgery." *Id.* Finally, the ALJ discounted Carter's testimony about post-surgery pain. *Id.* He thus concluded that Carter's knee impairments were adequately controlled and not severe. *Id.*

Turning to Carter's back pain, the ALJ noted that Carter had not mentioned her back during the hearing and that the clinical findings during her initial physical therapy evaluation had all been negative or mild. He concluded that her back pain "had been adequately addressed with physical therapy, pain medication, steroids and muscle relaxants." *Id.* For Carter's final three impairments, the ALJ noted that her diabetes and

11

hypertension were controlled by medication and that her obesity did not cause more than a slight limitation in her ability to function. R. 17–18.

The ALJ commented that his severity determination was consistent with the state agency medical examiner who reviewed Carter's initial SSI application, Dr. Josephine Cader, M.D., R. 18. Dr. Cader concluded that Carter's impairments were non-severe and her ADLs were non-restrictive. *Id.* The ALJ gave this opinion "great weight because Dr. Cader performed a comprehensive review of the evidence and her opinions are consistent therewith." *Id.*

The ALJ concluded by stating that his non-severity finding was supported by Carter's ability to engage in her reported ADLs: making her bed, sweeping every other day, occasional driving, monthly shopping, weekly cooking, and helping prepare her granddaughter, who has cerebral palsy, for school.[7] R. 15, 18.

### 2. Analysis

Substantial evidence does not support the ALJ's conclusion that Carter's knee impairments were not severe. This conclusion rested largely on the ALJ's assessment of the effects of Carter's knee surgery. *See* R. 17 ("Since the claimant's knee problems have been addressed with surgery, and any remaining pain is adequately controlled with pain medication, the undersigned concludes that the impairment is not severe."). The record contains only one post-surgery treatment note, from a week after the operation. R. 184. Dr. Krome noted that the incision was healing well and that Carter reported mild pain while on post-operative medication.

---

[7] The ALJ stated that Carter also takes care of her great-grandson. R. 15, 18. The record reflects that Carter's granddaughter lives with her and that her grandson used to live with her, but has moved out and now visits about three times per week. *See* R. 31, 119, 123. Her physical therapy evaluation includes a note stating, "she also cares for her great grandson as well," but Carter does not mention any children except her two grandchildren. R. 192.

12

*Id.* Dr. Krome did not opine on the status of Carter's meniscal tear and osteoarthritis or the success of the surgery at resolving those issues.

Surgery does not presumptively resolve the issue it is meant to address. *See, e.g. Williams v. Colvin*, 5:13cv124, 2014 WL 652596, at *1 (E.D.N.C. Feb. 19, 2014) ("Dr. Barsanti performed a right knee arthroscopy and partial meniscectomy. The surgery seemed to work initially, but [eight months later], plaintiff continued to complain of right knee problems. A right knee MRI revealed significant pathology and a total knee replacement was recommended.") (citations omitted). There is insufficient evidence in the record to determine the outcome of Carter's surgery. When the ALJ concluded based on one treatment note that Carter's knee impairments had been addressed with surgery and controlled by pain medication, he made a medical judgment that he is not permitted to make. *See Murphy v. Astrue,* 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); *Manso-Pizarro v. Sec'y of Health & Human Servs.,* 76 F.3d 15, 17 (1st Cir.1996) ("[A]n ALJ, as a lay person, is not qualified to interpret raw data in a medical record."); *Whitney v. Schweiker,* 695 F.2d 784, 788 (7th Cir.1982) ("Because an [ALJ] as a rule is not a doctor, he should avoid commenting on the meaning of a test or clinical x-ray when there has been no supporting expert testimony.").

The rest of the record likewise does not contain substantial evidence to support the ALJ's conclusion. Dr. Krome's operative note states that he found evidence of mild to severe degenerative osteoarthritis within Carter's right knee. R. 178. Contrary to the ALJ's conclusion, there is nothing in Carter's cane prescription to indicate that it is temporary; it is for "severe degenerative arthritis [illegible] causing 'painful' pressure." R. 220. Both of Carter's treating physicians consistently diagnosed her with degenerative arthritis and osteoarthritis. Though the

13

findings were usually mild to moderate, X-rays, MRIs, and physical examinations consistently revealed signs of osteoarthritis. Carter's medical history shows a diligent and escalating effort to treat her knee issues, including getting multiple diagnostic tests, consulting a specialist, attempting physical therapy, managing pain with narcotics, and undergoing surgery. By comparison, cases where non-severe osteoarthritis findings are upheld usually involve sporadic findings and less extensive treatment. *See, e.g.*, *Bradley v. Astrue*, 2:11cv976, 2013 WL 1077601, at *9–11 (S.D. W.Va. Jan. 15, 2013) (upholding finding of non-severe back pain and osteoarthritis of the knee when the claimant had inconsistently claimed pain, never had an abnormal MRI, never seen a specialist, and treated the pain with only Ibuprofen); *Edmunds v. Colvin*, 4:12cv51, 2013 WL 4451224 (W.D. Va. Aug. 16, 2013) (upholding non-severity finding when claimant's x-ray showed signs of osteoarthritis, but her physical examinations were normal, she never sought specialized treatment, and she was not diagnosed with osteoarthritis or prescribed medication for it).

Furthermore, the ALJ improperly afforded Dr. Cader's opinion "great weight." In determining what weight to afford a doctor's opinion, the ALJ must consider all relevant factors, including the relationship between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, and whether the doctor's opinion pertains to his area of specialty. 20 C.F.R. § 416.927(c). "[B]ecause nonexamining sources have no examining or treating relationship" with a claimant, the weight afforded to their opinions depends on how well they support their conclusions and "the degree to which the[ir] opinions consider all of the pertinent evidence in [a] claim." *Id.*; *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ("[T]he [opinion] of a non-examining physician can be relied upon when it is

14

consistent with the record."); *Nolan v. Colvin*, 4:13cv16, 2014 WL 2618571, at \*7 (W.D. Va. June 12, 2014).

Dr. Cader reviewed Carter's record on December 15, 2010. R. 45. The overwhelming majority of treatment notes and diagnostic findings in Carter's medical record were created after Dr. Cader gave her opinion. *See* R. 155–220. The medical records to which she had access consisted of four handwritten and largely illegible notes from Dr. Alabanza. *See* R. 45, 155, 160, 161, 162–63, 167. In support of her conclusions, Dr. Cader only referenced two of Dr. Alabanza's treatment notes, and she requested, but never reviewed Carter's X-ray. R. 45. It was inappropriate for the ALJ to afford "great weight" to the opinion of a non-examining source who did not consider the vast majority of pertinent evidence in Carter's claim. *See Wright v. Colvin*, 5:12cv2284, 2014 WL 1314996, at \*3–4 (D.S.C. Mar. 31, 2014) (finding a non-examining physician's opinion "of little significance" because it was made five months into an alleged twenty-three month disability period and therefore "necessarily excludes from consideration the majority" of the claimant's pertinent evidence); *Ellis v. Colvin*, No. 5:13cv43, 2014 WL 2862703, at \*14 (W.D. Va. Jun. 24, 2014) ("The ALJ noted the state agency consultants' opinions in his decision, and afforded them only limited weight because the consultants did not have the opportunity to observe Ms. Ellis or the opportunity to consider additional evidence submitted subsequent to their review of the record.") (internal quotation marks omitted).

When the state agency reconsidered Carter's application, Dr. Wyatt S. Beazley III, M.D., examined her medical records as of January 31, 2011. R. 51–53. In finding that Carter did not have a severe impairment, Dr. Beazley referred to her X-ray results and an additional treatment note from Dr. Alabanza. R. 51. There is no evidence in the ALJ's opinion that he depended on Dr. Beazley's evaluation, but even if he had, Dr. Beazley's opinion is entitled to little more

15

weight than Dr. Cader's. Dr. Beazley still lacked significant, material medical records, including Carter's treatment records from Danville Orthopedic, physical therapy evaluation, MRI results, meniscus tear diagnosis, and surgery.

The ALJ also questioned Carter's credibility. A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. *See Bishop v. Comm'r of Soc. Sec.*, --- F. App'x ---, 2014 WL 4347190, at *2 (4th Cir. Sept. 3, 2014) (per curiam); *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.). Assuming the ALJ's credibility determination was proper, his determination at step two is nonetheless inadequately supported by the record given his erroneous reliance on Dr. Cader's opinion and his unsupported conclusion that surgery resolved Carter's knee problems.

Carter also argues that her obesity must increase the limitations caused by her arthritic knees. Pl. Br. 13. The Commissioner has found that obesity can be an aggravating factor for other impairments, especially arthritis. *See* Soc. Sec. R. 02-1, 2002 WL 34686281, at *6 (Sept. 12, 2002) ("[T]he combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."). The ALJ acknowledged Carter's obesity and found that it did not cause more than a slight limitation. R. 17–18. As I find that the rest of the record does not provide substantial evidence to support the ALJ's conclusion, it is unnecessary to evaluation Carter's obesity other than to note, as did the ALJ, that it contributed to her limitations.

16

## IV. Conclusion

The record contains evidence of degenerative osteoarthritis in Carter's knees, a meniscal tear in her right knee, and obesity. Moreover, the ALJ's determination that Carter's knee problems were resolved by surgery was premature and not supported by the record. Finally, the ALJ's reliance on Dr. Cader's opinion was misplaced as the DDS physician did not have the benefit of almost all of the relevant medical evidence. Based on this record, the ALJ's determination that Carter does not have a severe impairment, i.e., a slight abnormality with more than a minimal effect upon her ability to work, is not supported by substantial evidence. *See Evans*, 734 F.2d at 1014. For the foregoing reasons, I find that substantial evidence does not support the Commissioner's final decision. Therefore, I recommend that this Court **GRANT** Carter's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 18, **REVERSE** the Commissioner's final decision, and **REMAND** this case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g).

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: October 7, 2014

Joel C. Hoppe
United States Magistrate Judge